JOHN CLEMENTS, Respondent, v. THE CONNECTICUT INDEMNITY COMPANY, Appellant.

*Life insurance policy — false answers to questions in the application which are made warranties.*

By the terms of applications for a policy of life insurance the answers to the questions asked therein were made warranties, and by the policy issued thereon it was declared that the applicant was insured "in consideration of the statements, agreements and warranties made in the application" therefor, and that "the application, on the faith of which this policy issues, is hereby referred to and made part of this contract, and the insured hereby agrees that the answers and statements therein contained are material, and that they are full, complete and true."

On the trial of an action brought to recover the amount of the policy, it appeared that the applicant's answers to the questions in the applications contained a statement not only false but known by the applicant to be false.

*Held*, that there had been a breach of warranty which avoided the policy.

APPEAL by the defendant, The Connecticut Indemnity Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Cattaraugus on the 14th day of May, 1897, upon the verdict of a jury, and also from an order entered in said clerk's office on the 20th day of May, 1897, denying the defendant's motion for a new trial made upon the minutes.

The defendant is a life insurance company organized under the laws of the State of Connecticut and doing business in this State.

On the 19th day of June, 1895, one James Clements applied to one of the defendant's agents by the name of McGeorge for an insurance upon his life in the sum of $3,000, and demanded what was known as "The Ideal. Natural Premium Policy. Indemnity. Class, First." This application was forwarded to one Sherman, the defendant's manager of agencies, by whom it was in turn forwarded to F. W. Barrow, the defendant's general agent or superintendent at the city of Buffalo. Upon the receipt thereof, Barrow sent for McGeorge and informed him that the defendant only wrote policies upon the plan asked for in sums of either $5,000 or $10,000, and that if Clements insisted upon that form of policy another application would be necessary.

In the first application, which was accompanied by the report of the medical examiner, it was stated that the applicant had a " slight systolic murmur " which had " diminished steadily for the past six or eight years and is now nearly inaudible." It also stated that application for insurance had been made to other insurance companies or associations upon which a policy had not been issued, and that he, Clements, did not know the names of the companies; and in another part of his application in answer to the question, " Have you ever been rejected by any insurance company, association or society ? " the applicant answered, " Not that I know of."

In the course of the interview between McGeorge and Barrow it was stated by the former that he thought Clements did not know that his previous application had been rejected, whereupon Barrow said that the answer to the inquiry concerning previous applications should have been " No " instead of " Not that I knew of; " and the evidence tends to show that the answer was thereupon altered so as to conform to the suggestion thus made. Barrow also requested the agent to have another examination made of Clements' heart and to report the result to him, and if not satisfactory he would send a physician down from Buffalo to make a still further examination. A new application was thereupon filled out by Barrow and delivered to McGeorge with directions to have Clements sign it and return the same with the report of the supplemental medical examination. Accordingly, on the fifth day of August following, McGeorge and *Dr. Kales, the medical examiner of the defendant,* went to Clements' house where an examination was had which proved satisfactory.

Clements thereupon signed the new application without reading it, and in due course of time a policy for $5,000 was issued upon his life, the plaintiff being one of the beneficiaries named therein, and the amount of his interest being $2,000. This policy was dated August 9, 1895, and the assured died on the second day of May following.

*Isaiah Fellows, Jr.,* for the appellant.

*George E. Spring,* for the respondent.

ADAMS, J. :

The facts above narrated, as to which there is little or no dispute, form a curious chapter of life insurance, and they tend to explain

in some measure why it is that the time and attention of the courts are so constantly occupied in efforts to determine intricate and perplexing controversies arising between insurance companies and their patrons. Were these the controlling facts of the case under consideration they would, doubtless, call for an examination of some quite novel and interesting legal questions; but they are referred to by reason of their historical significance more than anything else, for, upon a perusal of the entire record, we discover other facts which are really more potential in determining the result of this appeal, and these we will now consider.

The two applications preceding and forming the basis upon which the policy in suit was issued, while containing several statements of a somewhat conflicting character, also contain others as to which there is no uncertainty whatsoever, and of the latter class there is at least one which we deem of supreme importance.

Each of these applications appears to be divided into three parts, the first and second of which are signed by the applicant, and the third by the medical examiner. Part first contains inquiries concerning the physical condition of the applicant, as well as that of his ancestors and other immediate relatives; and among the questions there asked of the applicant are the following, viz.:

" 6. (a) What other physician have you consulted?·

(b) When and for what?"

In the first application the answer to each of these inquiries is, " None." In the second, the answer to subdivision " a " is the same, while to subdivision " b " there is no answer whatever. So that we have the deliberate and unqualified statement of the insured that no physicians, save the one specifically mentioned by him as his attending physician, had been consulted by him prior to the time when his statement was made and signed.

Now, what are the undisputed facts of the case? Dr. Charles D. McLouth was called as a witness for the defendant, and testified that prior to May, 1884, he treated Clements for a " Colles fracture " of the wrist, and that, while he never treated him for any sickness, he did attend him prior to the year 1884, and found that he then had a weak heart, accompanied by difficult breathing, palpitation, hurried respiration and weak pulse; that in 1887 he discovered the same condition of things, although in a somewhat modified form, and that

he made both of these examinations at the request of Clements. Dr. Elbert L. Fish, another physician, testified that in the fall of 1894 he was called in to consult with Dr. Kales, who was then attending Clements for the grippe; that he then made an examination of the assured and found him apparently convalescing from pneumonia, with a weak, irritable heart. While another physician, Dr. Walker, testified that in 1886 he made an examination of Clements for the purpose of enabling him to take out a policy of life insurance, but finding a systolic murmur of the heart present he did not complete his examination. He further testified that in 1892 or 1893 Clements came to his office for advice; that he then made a physical examination of him and discovered "an eczematous condition of the anus," for which he treated him. And Dr. Charles W. Guild testified that in June, 1894, he examined Clements and prescribed for him for the same difficulty. Thus it will be seen that within a period of ten years immediately preceding the filing of his application with the defendant the applicant had consulted at least four other physicians, and had received advice or treatment from each one of them for some bodily disorder, and that notwithstanding this fact he assured the defendant that he had consulted no other physician whatever. It is hardly necessary to suggest that the answers which the assured assumed to give to the inquiries made of him were untrue, and the simple inquiry which, therefore, presents itself is: What effect did such answers necessarily have upon his contract of insurance?

Each of the applications signed by Clements contained the following provisions or stipulations: (1) "I hereby declare that the accompanying application to the Connecticut Indemnity Association * * * for an insurance on my life was signed by me, and that I renew and confirm my agreement therein * * *."

(2) "I hereby warrant and agree, I. That all the foregoing statements and answers written and those contained in Part II, made, or to be made, to the medical examiner are full, complete and true, and that Part I and Part II of this application are offered to the association as a consideration for any policy hereby applied for."

In the policy which was subsequently issued it is declared that the life of James Clements is insured "in consideration of the statements, agreements and warranties made in the application" there-

for, and that "the application on the faith of which this policy issues is hereby referred to and made part of this contract, and the insured hereby agrees that the answers and statements therein contained are material, and that they are full, complete and true; that he has verified, and adopts as his own, each statement, representation and answers made therein, whether written by him or not, and that statements made to an agent and not therein written shall form no part of this contract."

It is apparent, therefore, that the basis of, and the consideration for, the contract of insurance upon which the plaintiff rests his claim was the information imparted by the application of the assured, which was warranted by him to be both material and true, and that information being manifestly untrue, it follows that there has been a breach of warranty which, it seems almost unnecessary to add, avoids the policy. (*Hanna* v. *Mutual Life Assn.*, 11 App. Div. 245; *Roche* v. *Supreme Lodge K. of H.*, 21 id. 599; *Story* v. *United Life & A. Ins. Co.*, 4 N. Y. Supp. 373; affd., 125 N. Y. 761.)

It is now a well-established principle of the law of insurance that the effect of a warranty is to make void the policy if all the representations of the assured, upon which the policy is issued, are not substantially true, and this without regard to their actual materiality. (*Foot* v. *Ætna Life Ins. Co.*, 61 N. Y. 571; *Cushman* v. *U. S. Life Ins. Co.*, 63 id. 404; *Dwight* v. *Germania Life Ins. Co.*, 103 id. 341.)

There are, of course, exceptions to this as there are to almost every other rule; as by way of illustration, where the falsity of the warranty is known to the insurer at the time of issuing its policy; but the present case is not embarrassed by any such complications; for although it does appear that the defendant's agent was informed that there was some impairment of Clements' heart action due either to organic or functional derangement, it does not appear that it was of such a character as to arrest the attention of any other physician than Dr. Kales. Nor can it be inferred that the defendant was aware that Clements had consulted four different physicians for certain bodily ailments, because he at one time suffered a fracture of the wrist, which doubtless required and received the care and attention of a surgeon.

There are several other statements contained in the two applications which the evidence tends very strongly to establish the falsity of, as, for instance, that no physician had given an unfavorable opinion upon the applicant's life with reference to life insurance. Clements knew that he had been examined for life insurance previous to the examination of Dr. Kales ; and he likewise knew that a prior application for life insurance had not been accepted, for he so stated in his first application.  He must, therefore, have been aware that such rejection was based upon an unfavorable opinion as to his physical condition.  This being the case, his answer not only contained a false statement, but one which he knew to be such.

Again, he stated in both applications that he was not subject to palpitation or difficulty in breathing, whereas the uncontradicted evidence is that he had been thus troubled for several years.   He further represented that his habits had always been temperate and sober, although in his first application he qualified this statement by saying that he " formerly used some beer ; " and the falsity of this representation is likewise fully established by the evidence of witnesses who frequently saw him under the influence of liquor. It is but fair to say, however, that there are circumstances attending some if not all of these representations which it is claimed take them out of the operation of the rule which has just been adverted to, and this contention is not without some substantial foundation ; but the breach of warranty to which we have directed our principal consideration seems so clearly established and so fatal to the plaintiff's case that we do not deem it necessary to give to the other questions which have been presented the examination which they would otherwise be entitled to receive.   For the reason first stated we think that the judgment and order appealed from should be reversed and a new trial granted.

All concurred.

Judgment and order reversed and a new trial ordered, with costs to the appellant to abide the event.